IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 08-cv-02587-PAB-KMT

PETER BRADLEY,

      Plaintiff,

v.

DENVER HEALTH AND HOSPITAL AUTHORITY,
d/b/a Denver Health Medical Center,

      Defendant.

_____

## ORDER
_____

      This matter comes before the Court on defendant Denver Health and Hospital

Authority's ("Denver Health") motion for summary judgment [Docket No. 39] and plaintiff

Peter Bradley's motion to strike evidence [Docket No. 47].

## I.  JURISDICTION

      Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964 and the Age

Discrimination in Employment Act (ADEA), both federal laws.  Therefore, the Court has

federal-question jurisdiction pursuant to 28 U.S.C. § 1331 over plaintiff's claims.

However, the Tenth Circuit has suggested that, because issues of Eleventh

Amendment immunity implicate the Court's subject-matter jurisdiction, any such issues

deserve threshold treatment.  *Martin v. Kansas*, 190 F.3d 1120, 1126 (10th Cir.1999),

*overruled on other grounds*, *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356

(2001) ("Because the State's assertion of Eleventh Amendment immunity challenges

the subject matter jurisdiction of the district court, the issue must be resolved before a court may address the merits . . . .").

There is some disagreement in this District regarding whether Denver Health, an entity which is affiliated with the State of Colorado, is entitled to raise Eleventh Amendment immunity. *Compare Darris v. Pugliese*, No. 08-cv-02624-PAB-KMT, 2009 WL 3162630 (D. Colo. Sept. 30, 2009) (Denver Health is not entitled to immunity under the Eleventh Amendment), *with Langmade v. Denver Police Dep't*, No. 07-cv-02287-BNB, 2007 WL 4178475, at *1 (D. Colo. Nov. 26, 2007) (Denver Health is entitled to immunity under the Eleventh Amendment). While the opinions cited here have come to preliminary conclusions, no court has evaluated the status of Denver Health under the analysis detailed in cases such as *Steadfast Insurance Co. v. Agricultural Insurance Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007). The present record contains insufficient evidence on which to make such a determination.

The Court does not believe that the unsettled matter of Denver Health's entity status prevents the adjudication of the present motions. For one thing, Denver Health has not formally raised the defense. The final pretrial order does contain the somewhat vague statement that "[s]ince Denver Health is a governmental entity, liquidated damages may not be awarded against it." Final Pretrial Order [Docket No. 59] at 3. However, Denver Health has not raised the immunity issue in the context of the present motion. Because Eleventh Amendment immunity may be waived in certain circumstances, *see, e.g.*, *Steadfast Ins. Co.*, 507 F.3d at 1252-53, the Court will not consider the applicability of the defense *sua sponte*. *Cf. Wisconsin Dep't of Corr. v.*

*Schacht*, 524 U.S. 381, 389 (1998) ("Unless the State raises the matter [of Eleventh Amendment immunity], a court can ignore it.").  Secondly, although the Eleventh Amendment generally precludes ADEA claims against the state, *see Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91 (2000), it does not similarly prevent Title VII claims, *see Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976).  As a result, even if it were determined that Denver Health is entitled to immunity under the Eleventh Amendment, such a defense would not dispose of the entire case.  Furthermore, because plaintiff's ADEA claim fails on its merits, the Court sees no reason why it should await the possible invocation of an Eleventh Amendment defense to resolve the matter. Consequently, the Court will proceed to the merits of the present motion without resolving the uncertainty surrounding questions of Denver Health's potential Eleventh Amendment immunity.

## II.  BACKGROUND

### A.  Factual Background

Plaintiff Peter Bradley, a licensed Clinical Social Worker, began working at Denver Health in 1994, when Denver Health was part of the City and County of Denver. In 1997, Denver Health separated from the City and County of Denver and became a political subdivision of the State of Colorado.  *See* Colo. Rev. Stat. § 25-29-103(1) (2010).  Linda Lenander is the Director of Denver Health's Clinical Social Work Department.  At the beginning of 2007, three Clinical Social Work Supervisors reported directly to Ms. Lenander.  Two of those supervisors – Teri Classick and Jennifer Hannon – supervised Clinical Social Workers at Denver Health's main hospital and

neighborhood clinics.  A third supervisor, Abigail Mann, supervised Clinical Social Workers that operated out of clinics in the Denver public school system.  Clinical Social Work Supervisors at Denver Health are expected to work closely with Ms. Lenander, supervise and evaluate Clinical Social Workers, communicate and carry out Denver Health policies, and take a proactive role in the administrative functioning of the Clinical Social Work Department.

In the spring of 2007, Ms. Mann announced her resignation from the school-based Supervisor position, and Denver Health initiated the process of finding her replacement.  Under the standard procedure, job openings are posted on Denver Health's website and both employees and the public may apply.  Denver Health generally seeks to hire or promote the best candidates for open positions, regardless of whether they are existing employees or external candidates.  Seniority at Denver Health and sheer number of years of experience are not significant factors in hiring or promotion.

The duties of a Clinical Social Work Supervisor differ substantially from those of a Clinical Social Worker.  Therefore, the fact that a Clinical Social Worker performs well in that non-supervisory role does not necessarily mean that he or she would be a good selection for a Clinical Social Work Supervisor position.

In the spring of 2007, Mr. Bradley and several other individuals applied for the position being vacated by Ms. Mann.  A panel composed of Ms. Lenander, Ms. Classick, Ms. Hannon, and Ms. Mann interviewed each of the applicants in May of that year.  The panel asked all of the applicants the same interview questions, and afterwards the panel members discussed the applicants' strengths and weaknesses.

While she took into consideration the opinions expressed by the other interviewers, Ms. Lenander had final decision-making authority.

All four interviewers agreed that Sara Schwab, a Denver Health Clinical Social Worker, was the best candidate for the school-based supervisor job. Ms. Classick and Ms. Lenander did not believe Mr. Bradley was qualified for the job, and Ms. Mann did not think him to be even a close competitor. As a result, Ms. Schwab received the promotion over Mr. Bradley. Mr. Bradley's complaint does not challenge the decision to promote Ms. Schwab instead of Mr. Bradley.

In the fall of 2007, all three supervisor positions became open as a result of the resignations of Ms. Classick, Ms. Hannon, and Ms. Schwab. Mr. Bradley applied for all three positions. Mr. Bradley and most of the other applicants were each interviewed by a panel composed of Ms. Lenander, Ms. Hannon, and Ms. Schwab. The panel asked each of these candidates the same interview questions. At the end of the process, Ms. Lenander selected Kaelynn Eaton and Amanda Loehr, both licensed Clinical Social Workers at Denver Health, to fill the hospital-based supervisor positions. All four interviewers agreed with the decision.

Ms. Lenander claims that Mr. Bradley was not selected because he was not suited for a supervisor position, was not the best candidate, and provided less appealing interview answers. Ms. Lenander claims that Ms. Eaton and Ms. Loehr were the best qualified candidates for the hospital-based supervisor positions because of their involvement in the department, their experience, their enthusiasm, and their interview answers.

Ms. Lenander decided to hire Jennifer Koch to fill the school-based supervisor position being vacated by Ms. Schwab.  Because Ms. Koch applied after Ms. Hannon and Ms. Schwab had left Denver Health, they did not interview Ms. Koch.  Instead, Ms. Lenander conducted the interview joined by Ms. Eaton and Ms. Loehr, who had not yet officially taken their newly-assigned supervisor positions.  Although Ms. Eaton and Ms. Loehr did not interview other candidates and, therefore, had no point of reference, they both expressed the opinion that Ms. Koch appeared to be an excellent candidate for the school-based supervisor position.  Ms. Lenander claims that Ms. Koch's experience, enthusiasm, and performance in the interview made her a better candidate for the school-based supervisor position than Mr. Bradley.

In the fall of 2007, Ms. Lenander was fifty-seven years old, Mr. Bradley was fifty-three years old, Ms. Eaton was thirty-two years old, Ms. Loehr was thirty-two years old, and Ms. Koch was thirty-six years old.  Mr. Bradley claims that the decisions to hire or promote Ms. Eaton, Ms. Loehr, and Ms. Koch were motivated by discrimination against Mr. Bradley based on his gender and/or age.  However, Mr. Bradley admits that, other than the hiring practices, he has not witnessed overt signs of discrimination against men or older individuals.  Denver Health claims that none of the decision-makers knew the ages of the candidates and, in any event, neither gender nor age was a factor in filling the supervisor openings.  In fact, Denver Health claims to have made promotion decisions that belie Mr. Bradley's accusations, including the promotion to supervisor of: Randall Yarbrough, a fifty-three-year-old male, in 2001; Carol Lewis, a fifty-three-year-old woman in 1998; and Teri Classick, a fifty-five-year-old woman, in 2006.  Mr. Bradley

does point out that Mr. Yarborough was the only applicant in 2001 and there appears to have been a specific request by another department that he be promoted.

### B.  Procedural Background

Mr. Bradley filed this case on November 26, 2008, asserting two claims for relief: one for age discrimination in violation of the ADEA and one for gender discrimination in violation of Title VII of the Civil Acts of 1964.  Compl. [Docket No. 1] at 3-5.  On October 2, 2009, Denver Health filed a motion seeking summary judgment on both claims.  *See* Denver Health's Mot. for Summ. J. [Docket No. 39].  On November 6, 2009, Mr. Bradley filed his response to the motion.  *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. [Docket Nos. 43 (sealed document) & 44 (public entry)].  On November 30, 2009, Denver Health filed a reply in support of its motion for summary judgment.  *See* Denver Health's Reply in Supp. of Mot. for Summ. J. [Docket No. 56].

On November 10, 2010, after filing his response, Mr. Bradley filed a motion invoking Federal Rule of Civil Procedure 56(e) requesting the Court strike certain evidence filed with Denver Health's motion for summary judgment.  *See* Pl.'s Mot. to Strike Inadmissible Evidence Pursuant to Fed.R.Civ.P. 56(e) [Docket No. 47] ("Pl.'s Mot. to Strike").  Denver Health responded to the motion, *see* Denver Health's Resp. to Pl.'s Mot. to Strike [Docket No. 57], and Mr. Bradley filed a reply, *see* Pl.'s Reply to Resp. to Mot. to Strike [Docket No. 66].  Both Denver Health's motion for summary judgment and Mr. Bradley's motion to strike are fully briefed and fit for disposition.

## III. ANALYSIS

### A.  Legal Standard – Summary Judgment

According to Federal Rule of Civil Procedure 56, a court should grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  In pursuing summary judgment, the moving party generally bears the initial burden of showing the absence of a genuine dispute concerning a material fact in the case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.  However, to be

clear, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

### B. Motion to Strike Evidence

In the context of a summary judgment motion, a court may consider only admissible evidence. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). That being said, while "the content or substance of the evidence must be admissible," the evidence need not be "in a form that would be admissible at trial." *Adams v. American Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quotation marks omitted).

Mr. Bradley asks the Court to strike four pieces of evidence which defendant Denver Health submitted in conjunction with its motion for summary judgment. The first set of evidence relates to Denver Health's 2009 amendment of its official job descriptions, including the Clinical Social Work Supervisor positions for which Mr. Bradley applied. *See* Pl.'s Mot. to Strike at 2-3. The disputed evidence regarding the

amendment process consists of an affidavit statement by Linda Lenander, an affidavit statement by Gregory Rossman, and an exhibit which is an email purportedly describing the process. *See* Denver Health's Mot. for Summ. J., ex. A-2 (Lenander Aff.) ¶ 11; ex. A-3 (Rossman Aff.) ¶ 8; ex. A-30 (Email from G. Thress).

Mr. Bradley argues that the disputed evidence is irrelevant and should be excluded. Denver Health contends that the evidence supports its position that the previous descriptions were not binding and were not followed in practice and that the description was outdated at the time Denver Health decided not to promote Mr. Bradley.

Under the Federal Rules of Evidence, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." Fed. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

The Court finds that the evidence of defendant's amendment of its official job descriptions is relevant to this case. It is true that the amendment came two years after Denver Health's decisions not to promote Mr. Bradley. However, it may help show, as Denver Health argues, that the official descriptions of the jobs were outdated and generally ignored by the individuals in charge of making hiring decisions. On the other hand, this evidence may support Mr. Bradley's contention that Denver Health's explanations for not promoting him amount to *post hoc* rationalizations and pretext. In fact, because the Court is compelled to adopt this latter inference due to the fact that

the case appears before the Court on Denver Health's motion for summary judgment, striking this evidence seems especially unnecessary. In sum, the Court finds that the evidence regarding Denver Health's 2009 amendment of the official descriptions of the Clinical Social Work Supervisor positions is relevant to this case and, as such, the evidence will not be stricken.

The second evidentiary issue has to do with Linda Lenander's description of a report she purportedly received about Mr. Bradley. *See* Pl.'s Mot. to Strike at 3-4. In an affidavit submitted with Denver Health's motion for summary judgment, Ms. Lenander states the following:

> I was once forwarded by Terence Shea of Denver Health a series of emails that were, as I recall, between Mr. Bradley and a health care provider, and although I no longer have those emails, I recall the gist of them being that the provider wanted Mr. Bradley to do something specific for a patient, and Mr. Bradley, responding in a somewhat angry and hostile tone, felt that it was not his job.

Denver Health's Mot. for Summ. J., ex. A-2 (Lenander Aff.) ¶ 17.

Plaintiff objects to Ms. Lenander's testimony regarding the emails she received from Terence Shea because, "[t]o the extent Ms. Lenander is testifying to what Terence Shea told her, this is inadmissible hearsay." Pl.'s Mot. to Strike Inadmissible Evidence Pursuant to Fed.R.Civ.P. 56(e) [Docket No. 47] at 3. Pursuant to the Federal Rules of Evidence, "[h]earsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." Fed. R. Evid. 802. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801.

In the present case, defendant is not offering Ms. Lenander's statement regarding the emails in order to prove the truth of the matter asserted in those emails, namely, how Mr. Bradley acted in that situation. Instead, the emails are discussed in order to demonstrate the effect they had on Ms. Lenander and her view of Mr. Bradley. In a widely recognized exclusion from the definition of hearsay, "[s]tatements offered for the effect on the listener . . . are generally not hearsay." *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993).

Plaintiff also argues that the Court should strike Ms. Lenander's testimony about Mr. Shea's emails because they have not been produced and, therefore, cannot be authenticated. For the same reason, plaintiff also argues that there is no reliable way of testing what the emails actually say and no way of knowing to what time period they are related.

The Court first notes that, because the emails themselves have not been submitted for the Court's consideration, there is nothing to authenticate. The rest of plaintiff's arguments go to the weight and reliability of Ms. Lenander's testimony regarding these emails and their effect on her decision. These are determinations which the Court cannot make at the summary judgment stage. *See Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))).

Finally, Ms. Lenander's statement ultimately is of little assistance in resolving the current dispute. For one thing, the statement's lack of substance and context makes it impossible to evaluate its implications. Ms. Lenander merely testifies that to the best of her obviously limited recollection of Mr. Shea's emails, somebody wanted Mr. Bradley to do something and he objected. Ms. Lenander does not explain why the emails were sent to her. She does not explain what the actual request of Mr. Bradley was or whether the request was appropriate and the objection warranted. In fact, to the extent that plaintiff could respond to Ms. Lenander's vague recollection, he offers a potential alternative which undermines Ms. Lenander's report of how the emails affected her. Plaintiff deduced that Ms. Lenander may have been discussing a situation in which Mr. Bradley was asked to provide medical services to a patient for which he was not trained. As discussed earlier, at summary judgment, the Court must make all justifiable inferences in favor of the non-moving party, i.e. Mr. Bradley. *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). As discussed in more detail below, the Court will assume that a jury would view Ms. Lenander's vague recollection and her characterization of Mr. Shea's emails as a basis of potential pretext. Therefore, the Court sees no reason to strike Ms. Lenander's statement regarding emails she received from Mr. Shea. Plaintiff's motion to strike is denied.[1]

---

[1] Because Mr. Bradley's motion to strike fails on the merits, the Court does not need to address Denver Health's argument that the motion should be denied because of plaintiff's failure to confer as required by D.C.COLO.LCivR 7.1A.

## C.  Title VII Claim

### 1.  Legal Standard

Under Title VII of the Civil Rights Act of 1964, as amended, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1) (2006).  Title VII's prohibition on discrimination protects members of both historically disfavored groups and historically favored ones.  *See Livingston v. Roadway Express Inc.*, 802 F.2d 1250, 1252 (10th Cir. 1986).  Claims such as Mr. Bradley's, brought by individuals belonging to a group that historically has not been discriminated against, have been characterized as claims for "reverse discrimination."  *See Notari v. Denver Water Dep't*, 971 F.2d 585, 588 (10th Cir. 1992).

"There are two general methods by which a plaintiff may proceed on a reverse discrimination claim."  *McGarry v. Board of Cnty. Comm'rs of Cnty. of Pitkin*, 175 F.3d 1193, 1199 (10th Cir. 1999).  The first method parallels the familiar analysis coming out of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  In *McDonnell-Douglas*, the Supreme Court established a three-part paradigm for evaluating a typical Title VII disparate treatment claim:

> First, the plaintiff must establish a prima facie case of discrimination. Second, if the plaintiff carries his initial burden, the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the challenged workplace decision.  Third, if the defendant carries this burden, the plaintiff has an opportunity to prove that the legitimate reasons the defendant offered were merely a pretext for discrimination.

*Notari v. Denver Water Dep't*, 971 F.2d 585, 588 (10th Cir. 1992) (citing *McDonnell Douglas*, 411 U.S. at 802).

At step one, in order to establish a prima facie case for a typical Title VII claim, a plaintiff must show "that (1) the plaintiff belongs to some protected class, (2) the plaintiff was qualified for the position or benefit at issue, (3) the plaintiff suffered an adverse employment action, and (4) the plaintiff was treated less favorably than others (e.g., the position at issue remained open after the adverse employment action)." *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1201 (10th Cir. 2006) (quoting *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004)) (quotation marks omitted). This model has been altered to fit the particular circumstances of a wide variety of claims. For example, "in a promotion case, such as this one, a plaintiff fulfills the fourth element when he shows that the position was filled by another." *Notari*, 971 F.2d at 588 (citing *Mortensen v. Callaway*, 672 F.2d 822 (10th Cir. 1982). In a reverse discrimination case, the first element – membership in a protected class – also is adjusted.

The *McDonnell Douglas* formulation creates a presumption prior to the completion of trial "that unless otherwise explained, discrimination is more likely than not the reason for the challenged decision." *Notari*, 971 F.2d at 589; *see also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) ("Once there has been a full trial on the merits, the sequential analytical model adopted from *McDonnell Douglas* drops out and we are left with the single overarching issue whether plaintiff adduced sufficient evidence to warrant a jury's determination that adverse employment

action was taken against the plaintiff because of his or her protected status." (quoting *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 744 (10th Cir. 1991)) (quotation marks and omission marks omitted)).  As a result, while "[f]or most plaintiffs, establishing a prima facie case is perfunctory, and liability turns on whether the defendant's stated explanation for the adverse employment action is pretextual," that is not necessarily true in reverse discrimination cases.  *Argo,* 452 F.3d at 1201.  Instead, "because the presumptions in Title VII analysis that are valid when a plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of an historically favored group," *Notari*, 971 F.2d at 589 (quotation marks omitted), a reverse-discrimination claimant must make a "stronger showing" of a prima facie case of discrimination.  *Argo,* 452 F.3d at 1201.  Under this "stronger showing," a claimant establishes a prima facie case where, "in lieu of showing that he belongs to a protected group, [he] establish[es] background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Argo,* 452 F.3d at 1201 (quoting *Notari*, 971 F.2d at 589).

The modified *McDonnell Douglas* analysis described here is not the only way a reverse-discrimination claimant may proceed on a Title VII claim.  A plaintiff also may survive summary judgment by producing "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff."  *McGarry*, 175 F.3d at 1199 (quoting *Notari*, 971 F.2d at 590) (quotation marks omitted).  "Under this alternative formulation, it is not enough to allege that a plaintiff was qualified and that

someone of a different [sex] was promoted." *Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997) (citing *Notari*, 971 F.2d at 590). "Rather, the plaintiff must allege and produce evidence sufficient to support a reasonable inference that but for the plaintiff's status, the challenged decision would not have occurred." *Taken*, 125 F.3d at 1369 (citing *Notari*, 971 F.2d at 590).

### 2. *Prima Facie Case of Reverse Discrimination*

In its motion for summary judgment, Denver Health argues that Mr. Bradley failed to establish a prima facie Title VII case under the modified four-part *McDonnell Douglas* test in reverse discrimination cases. Specifically, Denver Health asserts that Mr. Bradley has failed to establish background circumstances that support an inference that Denver Health is one of those unusual employers who discriminates against the majority. *See* Denver Health's Mot. for Summ. J. at 15. Denver Health later argues that Mr. Bradley also has not met the alternative articulation from *Notari*, namely, that a plaintiff may establish a prima facie case through indirect evidence sufficient to support a reasonable probability that, but for the plaintiff's status as a male, the challenged employment decision would have favored the plaintiff.

In his response, Mr. Bradley addresses only the latter "but-for" method of establishing a prima facie case. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12-13. In its reply, Denver Health appears to argue that Mr. Bradley may not rely on indirect evidence outside of the *McDonnell Douglas* four-part test for establishing a prima facie case. In the alternative, Denver Health argues that insufficient indirect evidence exists. *See* Denver Health's Reply in Supp. of Mot. for Summ. J. at 6-7 & n.6.

The first step under either method of establishing a prima facie case is the identification of the evidence of discrimination, followed by the determination of whether this evidence meets plaintiff's burden. In his response, Mr. Bradley identifies three facts which he believes establish the necessary connection between his status as a male and Denver Health's decision not to promote him. Mr. Bradley's first contention is that "the three female individuals who were promoted had markedly less experience than Mr. Bradley, and, in two instances, that of [Ms.] Eaton and [Ms.] Loehr, did not even meet the minimum qualifications." Pl.'s Resp. to Def.'s Mot. for Summ. J. Resp. at 14. Mr. Bradley's second evidentiary citation is to his characterization of the selection process as subjective. His third cited fact has to do with the lack of male representation in the jobs to which he applied: "There are currently no male clinical social work supervisors at Denver Health, and Ms. Lenander has, with one exception, never promoted a male to a social work supervisory position[,] except for Randall Yarbrough, who Defendant has admitted was the only applicant for that position." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 15 (emphasis in original).

Denver Health argues that this evidence is insufficient as a matter of law in several respects. First, Denver Health appears to contend that Mr. Bradley can rely on the *McDonnell Douglas* three-part burden-shifting framework only if he establishes the background circumstances that support an inference that Denver Health is one of those unusual employers who discriminates against the majority. *See* Denver Health's Reply in Supp. of Mot. for Summ. J. at 6. In support of this position, Denver Health cites its mistaken view of a recent Tenth Circuit case*, Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136 (10th Cir. 2008). *See* Denver Health's Reply in Supp. of

18

Mot. for Summ. J. at 6-7 & n.6 ("Although *Notari* refers to direct or indirect evidence, *Adamson* was decided 16 years after *Notari*, and it requires direct proof of discriminatory intent." (citation omitted)).  Denver Health's argument focuses on two statements from *Adamson*: (1) that "[a] plaintiff may rely either upon circumstantial evidence and the *McDonnell Douglas* presumption that arises from it *or* present direct proof of discriminatory intent," *Adamson*, 514 F.3d at 1150 (emphasis in original), and (2) that a reverse-discrimination plaintiff "is entitled to prove, through direct evidence and without reference to *McDonnell Douglas*, that his termination was, in fact, motivated by the fact that he is a man." *Adamson*, 514 F.3d at 1150.  Based on these statements, Denver Health argues that Mr. Bradley can only rely on the *McDonnell Douglas* method of proof where he attempts to prove a prima facie case under the modified four-part test discussed earlier in this order: (1) that background circumstances support an inference that the defendant is one of those unusual employers who discriminates against the majority, (2) that the plaintiff was qualified for the position or benefit at issue, (3) that the plaintiff suffered an adverse employment action, and (4) the plaintiff was treated less favorably than others.

Denver Health's confusion regarding the holdings in *Adamson* appears to be rooted in the fact that technically there are two formulations that come out of the *McDonnell Douglas* case.  The first formulation is the tripartite burden-shifting process which results in a presumption that the defendant's decision was based on discriminatory intent: (1) plaintiff establishes a prima facie case; (2) defendant articulates a nondiscriminatory reason or reasons for the challenged decision; and (3)

plaintiff establishes the pretextual nature of the defendant's articulated reasons. It is this tripartite formulation that *Adamson* referred to in explaining that "[w]here a plaintiff relies on circumstantial evidence, the Supreme Court has established a three step burden-shifting framework for determining whether a plaintiff's evidence raises an inference of invidious discriminatory intent sufficient to survive summary judgment." *Adamson*, 514 F.3d at 1145.

Under this three-part framework, there are at least two methods by which a reverse discrimination plaintiff may establish a prima facie case. The first method is based on the four-part test in *McDonnell Douglas* discussed above. The second method for establishing a prima facie case is by producing "indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff." *Notari*, 971 F.2d at 590. In its closing paragraph, the court in *Notari* stated: "The approach we announce today does not displace the *McDonnell Douglas* paradigm but simply provides an alternative basis upon which plaintiffs may satisfy their prima facie burden." *Notari*, 971 F.2d at 591. The *Notari* decision proceeded to explain that once a plaintiff satisfies the "but-for" alternative formulation, a court then considers whether the defendant can articulate a nondiscriminatory justification and whether that articulation is pretextual. *Notari*, 971 F.2d at 591. Thus, Denver Health's argument that *Adamson* somehow prohibits the use of indirect evidence to establish a but-for connection between plaintiff's status as a man and Denver Health's promotion decision is incorrect.

To the extent that Denver Health argues that *Adamson* in some way overruled *Notari*, this position also is unconvincing. *See* Denver Health's Reply in Supp. of Mot. for Summ. J. at 7 n.6. *Adamson* did not indicate that it intended to overrule *Notari* or question its reasoning and, in fact, it cited *Notari* as support for the sentences upon which Denver Health relies. *See Adamson*, 514 F.3d at 1150 (citing *Notari*, 971 F.2d at 589). Furthermore, recent Tenth Circuit decisions have relied on *Notari*'s allowance of indirect evidence to establish a prima facie case in reverse discrimination cases. *See, e.g.*, *Mitchell v. City of Wichita, Kansas*, 140 F. App'x 767, 777, 780-81 (10th Cir. 2005). Finally, the Tenth Circuit has reaffirmed the rulings in *Notari* following two Supreme Court decisions. *See Mattioda v. White*, 323 F.3d 1288, 1292-93 (10th Cir. 2003) (discussing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)). Therefore, contrary to Denver Health's contention, the "but-for" alternative articulated in *Notari* and subsequent cases does not fall wholly outside of *McDonnell Douglas*. Rather, it provides an alternative means of satisfying the first step in its three-step analysis.

Denver Health's apparent second basis for challenging Mr. Bradley's proffered evidence is that the evidence supports a claim for pretext rather than a prima facie claim of reverse discrimination. The gist of Denver Health's argument appears again to rest upon its mistaken understanding of *Adamson* and a plaintiff's reliance on indirect evidence in establishing a "but-for" connection. However, it is also worth noting that "a trier of fact may infer discriminatory intent from facts that also support a finding of pretext . . . ." *Adamson*, 514 F.3d at 1144. On the other hand, it is not true that "the

reverse assertion that evidence of 'pretext,' i.e. that an employer's stated reasons for an employment decision are inaccurate or untrue, compels [a finding of discriminatory intent]." *Adamson*, 514 F.3d at 1144.

With Denver Health's preliminary objections addressed, the Court now turns to the specific evidence which Mr. Bradley cites in support of his prima facie case of sex-based discrimination. Starting with Mr. Bradley's characterization that "the three female individuals who were promoted had markedly less experience than [him]," Pl.'s Resp. to Def.'s Mot. for Summ. J. at 14, the Court concludes that such an assertion does not create a genuine issue for trial. The record contains a variety of perspectives on the applicants' qualifications. The Court can discern no clear disparity in the qualifications of the applicants from which to infer discriminatory intent. Mr. Bradley is correct that the evidence demonstrates that he had the most experience in terms of years. *Compare* Denver Health's Mot. for Summ. J., ex. A-4 at 3, *with* Denver Health's Mot. for Summ. J., ex. A-10 at 2, ex. A-12 at 3-4, A-14 at 6-10. However, there is no evidence that the number of years of experience was a criterion or that it should have been. To the contrary, Denver Health states – without objection from Mr. Bradley – that its hiring decisions focus on the relevancy and quality of applicants' experience and their performance rather than their total years of experience.

Title VII does not allow a judge or jury to critique the wisdom or effectiveness of hiring criteria in finding the most qualified individual: "[I]t is not the duty of a court nor is it within the expertise of the courts to attempt to decide whether the business judgment of the employer was right or wrong. The court is not a super personnel department." *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983).

22

Instead, "[a]ll that a court does is to exercise a very limited review of the employment practices of an employer to see if the practices are shown to be lawful," that is, nondiscriminatory. *Verniero*, 705 F.2d at 390. Therefore, the Court is not in a position to determine, as an objective matter, which qualifications Denver Health should give the most weight in its hiring decisions. Consequently, Denver Health's selection of the preferred qualifications for the positions in question is not, by itself, evidence of sex-based discrimination.

Mr. Bradley makes a different type of assertion when he argues that successful applicants "in two instances, that of [Ms.] Eaton and [Ms.] Loehr, did not even meet the minimum qualifications." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 14. Here, rather than arguing that Denver Health chose the wrong criteria, he accuses Denver Health of not abiding by the criteria it selected. For example, Denver Health's official description of the "Supervisor, Clinical Social Work" position lists one of the "minimum qualifications" as "Three years experience of the type and at the level of Social Worker, [Licensed Clinical Social Worker]." Pl.'s Resp. to Def.'s Mot. for Summ. J., ex. 1 at 2. Mr. Bradley claims that Denver Health disregarded this requirement in order to effectuate its discriminatory policy of hiring women instead of men.

In response, Denver Health claims that the job description upon which Mr. Bradley relies was outdated and not binding on Ms. Lenander's hiring decisions. Instead, Denver Health claims that it was its policy to allow department directors or managers to determine the minimum requirements for an open position and that the postings for the Clinical Social Work Supervisor positions in 2007 stated that three years of experience as a Licensed Clinical Social Worker was "preferred," with no

reference to the experience being "required."  *See* Denver Health's Mot. for Summ. J.,

ex. A-3 (Rossman Aff.) ¶ 8; Denver Health's Mot. for Summ. J., ex. A-31; Denver

Health's Reply in Supp. of Mot. for Summ. J. at 1-2 ¶ 10.  Denver Health further argues

that, although all three of the women it ultimately hired over Mr. Bradley did not strictly

meet the minimum requirements in the official job description, each had experience

which Ms. Lenander was entitled to accept as equivalent.

The Court may not decide the truth of these issues.  The binding force of the

official policy versus Ms. Lenander's postings and the equivalency of the experience of

the successful female applicants are questions of fact to be determined by the jury.  If a

jury were to side with Mr. Bradley on these factual questions, this evidence could

convince that jury that Denver Health was bending its official policy in order to

discriminate generally against men or specifically against Mr. Bradley due to his status

as a male.  Because of the genuine dispute regarding this fact, and because this fact is

material to the disposition of Mr. Bradley's Title VII claim, the Court may not enter

summary judgment.

Similarly, a jury could find that Denver Health discriminated against men in

general, or against Mr. Bradley in particular, based on the fact that there are currently

no male clinical social work supervisors at Denver Health.  This potential inference of

discrimination is heightened by the fact that the only male Ms. Lenander has hired or

promoted to a Clinical Social Work Supervisor position was one who had no female

competition and who had another department lobbying in his favor.  While the jury may

decide that these facts do not demonstrate sex-based discrimination, they may infer

from them that Denver Health is one of those unusual employers who discriminates

24

against the majority or that, but for Mr. Bradley's status as a male, he would have received the promotion to one of the supervisor jobs. Therefore, the Court finds that Mr. Bradley has made out a prima facie case of reverse discrimination under both standards articulated above. On the one hand, he has shown: (1) that background circumstances support an inference that Denver Health is one of those unusual employers who discriminates against the majority, (2) that Mr. Bradley was qualified for the position at issue, (3) that Mr. Bradley suffered an adverse employment action, i.e., not being promoted, and (4) that the position was filled by another. In the alternative, Mr. Bradley also has produced indirect evidence sufficient to support a reasonable probability that, but for his status as a male, the challenged employment decision would have favored him.

### 3. Defendant's Nondiscriminatory Justifications

Once a plaintiff has met his burden in establishing a prima facie case of reverse discrimination – whether it be under the *McDonnell Douglas* four-part analysis or the alternative method in *Notari* – the Court turns to the second and third parts of *McDonnell Douglas*' three-part framework for evaluating a typical Title VII disparate treatment claim. *Notari*, 971 F.2d at 591. Therefore, the Court now considers whether Denver Health is able to articulate nondiscriminatory justifications for its promotion decisions and then whether Mr. Bradley has shown that those justifications are pretextual.

The reasons offered by Ms. Lenander, the decision-maker, for not promoting Mr. Bradley are explained in her affidavit as follows:

In my opinion Mr. Bradley was not a good candidate for promotion to any of the Supervisor positions that were open in 2007 for many reasons, including (in no particular order):

(1)     Mr. Bradley had not demonstrated initiative at the administrative level within the Department, having served on only one Department committee roughly seven years earlier, which was intended to help the Department become more efficient through the use of computers;

(2)     my perception was that Mr. Bradley did not provide sufficient leadership for that committee to produce significant results – a few forms were placed on the computer network, but not much else happened of which I was aware while Mr. Bradley was involved;

(3)     Mr. Bradley had spent virtually his entire career at Denver Health in one particular clinic, suggesting a lack of knowledge of and interest in other areas within the Department;

(4)     Mr. Bradley did not have supervisory experience other than with respect to non-professional entry-level workers in nonhealth care industries (a McDonald's restaurant and an oil and gas company over 20 years ago), which I considered of little relevance to supervising masters-level health professionals;

(5)     despite his many years in the same clinic at Denver Health, Mr. Bradley had never taken on the responsibility of supervising a MSW intern, demonstrating a lack of initiative and a lack of interest in supervising others;

(6)     I did not perceive Mr. Bradley to exhibit enthusiasm or interest during the interview, and I got the impression that he believed his seniority entitled him to promotion, rather than that he was genuinely interested in undertaking supervisory responsibilities within the Department;

(7)     I did not find Mr. Bradley's interview answers as impressive as those of other candidates;

(8)     I had previously observed Mr. Bradley with his eyes closed and apparently asleep during Department meetings; and

(9)     there had been past occasions, either reported to me or directly known to me, of Mr. Bradley not taking initiative or being reluctant to handle certain tasks or take on additional duties, including: (i)

consistent with my own view of Mr. Bradley's lack of initiative, that problem was reported by others on forms which I received and reviewed, as shown in Exhibit A-26; (ii) I was once forwarded by Terence Shea of Denver Health a series of emails that were, as I recall, between Mr. Bradley and a health care provider, and although I no longer have those emails, I recall the gist of them being that the provider wanted Mr. Bradley to do something specific for a patient, and Mr. Bradley, responding in a somewhat angry and hostile tone, felt that it was not his job; and (iii) Mr. Bradley contacted me at one point to state that he had been asked to do HIV testing in the community and did not think it should be part of his job – although he ultimately did such testing, it appeared to me that he did not do so willingly at first.

Denver Health's Mot. for Summ. J., ex. A-2 (Lenander Aff.) ¶ 17.  Ms. Lenander's

affidavit also explains that:

specifically with respect to all three open positions in the Fall of 2007, Mr. Bradley did not do well on certain interview questions intended to determine whether a candidate could distinguish between: (a) situations which a Supervisor should be able to handle and show initiative in how to handle them; and (b) situations which a Supervisor should take up the chain of command.  In his answer to an interview question regarding a serious policy violation, what he would do if he knew someone else was clocking in and out for an employee/friend of his, Mr. Bradley failed to state that he would take it up the chain of command, the answer I was looking for.  Instead, Mr. Bradley inappropriately said that he would tell his friend that he was "here to defend you."  **Exhibit A-7**, first question on pp. DH-0410, 0413, 0416.  The other candidates all indicated they would take it up the chain of command.  Conversely, in answering two other questions not involving serious policy violations, Mr. Bradley failed to demonstrate that he could recognize these situations as calling for him to take initiative to address the problems, instead saying that he would look to his supervisor (me) for guidance.  **Exhibit A-7**, third question on p. DH-0412, last question on p. DH-0413.  Mr. Bradley also gave "answer phones" and "make appointments" as examples of how he adapts to a variety of people or environments.  **Exhibit A-7**, fourth question on p. DH-0414.  The fact that Mr. Bradley was applying for all three openings rather than focusing on and demonstrating his interest and qualifications for one position was taken by me as a lack of focus, and it suggested to me that his interest was more for personal financial reasons than to apply particular skills and interests toward one job to help the Department. Further, with respect to the open school-based position in the Fall of 2007, it was my opinion that Mr. Bradley did not have the overall experience that

Ms. Koch had in dealing with adolescents, managing programs, and grant writing.

Denver Health's Mot. for Summ. J., ex. A-2 (Lenander Aff.) ¶ 19.

Based on the recitation above, the Court concludes that Denver Health has met its burden at the second step of the *McDonnell Douglas* analysis by articulating facially-legitimate, non-discriminatory reasons for its decision to not promote Mr. Bradley.

### 4. Whether Defendant's Justifications Are Pretextual

"A plaintiff can withstand summary judgment by presenting evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reason for the adverse employment action is pretextual." *Garrett*, 305 F.3d at 1217. "As a general rule, an employee must proffer evidence that shows each of the employer's justifications is pretextual." *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1126 (10th Cir. 2005).

"A plaintiff may establish pretext by showing that the employer's proffered reason for acting adversely towards him is unworthy of belief." *Adamson*, 514 F.3d at 1146. "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)). Some of the factors that may be consulted in determining the existence of pretext include: "prior treatment of plaintiff; the employer's policy and practice regarding . . . employment [of plaintiff's class] (including

28

statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating criteria); and the use of subjective criteria." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999)) (quotation marks and omission marks omitted). The Court now turns to the consideration of each of Denver Health's articulated reasons.

Regarding the first articulated reason – Ms. Lenander's assertion that Mr. Bradley had not demonstrated initiative at the administrative level within the department – the evidence is somewhat conflicting. It appears that his involvement on an administrative level in the department was of a different sort than the successful female candidates. However, even Ms. Lenander noted Mr. Bradley's leadership role on a departmental computer committee. Moreover, Ms. Lenander did not simply discount Mr. Bradley's involvement and effectiveness on the computer committee, she apparently disregarded it entirely or, as she claims, was not aware of his other activities that, at least, appear to be administrative and appear to show initiative. For example, Mr. Bradley presented evidence that he participated on a Consumer Advisory Board, that he developed a widely-adopted method for enrolling patients in the Medicare Part D program, and that at times he would fill in for supervisors. Mr. Bradley also testifies that he demonstrated his initiative through extensive volunteer activities that often directly or indirectly involve his responsibilities at work. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., ex. 6 (Bradley Aff.) at 5-7 ¶¶ 15, 17-27.

Denver Health attempts to discredit the import of these asserted facts and argues that the decision-maker, Ms. Lenander, was not aware of them. Denver Health

is correct that pretext is assessed by "examining the facts as they appear to the person making the decision to promote the plaintiff." *Santana v. City & County of Denver*, 488 F.3d 860, 865 (10th Cir. 2007) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000)) (quotation marks and omission marks omitted); *see* Denver Health's Reply in Supp. of Mot. for Summ. J. Reply at 9. That being said, every discrimination claim is not doomed simply because the employer claims to be unaware of facts which potentially contradict its position. There is a legitimate question as to whether Ms. Lenander's testimony is accurate. She to have access to negative reports about Mr. Bradley's work history, but no awareness of the positive reports which would seem to be as readily accessible. A jury may believe Ms. Lenander or it may not. Mr. Bradley, however, raises a genuine issue of fact as to whether this claimed reason was pretextual.

Ms. Lenander's second criticism of Mr. Bradley was that he had spent virtually his entire career at Denver Health in one particular clinic, suggesting a lack of knowledge of and interest in other areas within the department. Mr. Bradley asserts that this reason is pretextual, citing to the fact that he regularly interacts with other areas and departments throughout the hospital. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 6. Ms. Lenander claims that the interactions described by Mr. Bradley were not sufficiently meaningful. *See* Denver Health's Reply in Supp. of Mot. for Summ. J., ex. 6 ¶ 3.

On its face, Ms. Lenander's claim that Mr. Bradley's limited experience in other areas of the department influenced her decision is not pretextual. It is not the Court's job to critique this opinion if it is honestly held and appears to be the true reason for the

30

decision.  Notwithstanding this fact, it was Ms. Lenander's subjective choice to place so much emphasis on this factor.  Furthermore, the importance of this factor was not divulged prior to the decision.  Although the presence of subjectivity in the decision-making process will not, by itself, demonstrate pretext, it provides evidence of opportunity and often precipitates a more careful review of the articulated reason.  *See Santana*, 488 F.3d at 866.  Here, a jury could determine, in the context of the totality of the circumstances, that this reason was pretextual.  *Cf. Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000) ("In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury, in assessing whether there was impermissible discrimination and whether the defendant's proffered explanation is a pretext for such discrimination, would be entitled to view the evidence as a whole.").  This is particularly true in light of the fact that "when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility.  Under those circumstances, the jury need not believe the employer's remaining reasons."  *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1126 (10th Cir. 2005) (quoting *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000)) (quotation marks omitted).  Therefore, there is a genuine dispute of material fact regarding whether the defendant's second articulated reason for not promoting Mr. Bradley is pretextual.

Ms. Lenander next cites Mr. Bradley's lack of experience supervising professional healthcare workers.  Mr. Bradley argues that this explanation is pretextual because he had experience supervising employees in non-healthcare settings and

because two of the successful applicants lacked similar experience. Ms. Loehr only supervised non-professional volunteers and Ms. Eaton had no experience supervising anyone. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 7 ¶ 15(4). Finally, as mentioned above, there is evidence that Mr. Bradley, on occasion, took on the duties of an absent supervisor. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., ex. 24 (Brockman Dep.) at 5 (internal pagination 23: 4-13). There is more than one way that a jury could reasonably resolve the apparent inconsistency between Ms. Lenander's articulated reason for not promoting Mr. Bradley and the reality of the applicants' qualifications. Because one of the potential resolutions is that Denver Health is attempting to conceal its true discriminatory intent, the potential of pretext has been shown.

Ms. Lenander's next reason for not promoting Mr. Bradley is that he never took on the responsibility of supervising an intern. There is uncontested evidence that Mr. Bradley helped orient new personnel to the department. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., ex. 6 (Bradley Aff.) ¶ 27. It is not clear from the record what special significance the supervising of an intern has or why it would be more important than supervising anyone else. However, Mr. Bradley points out that Ms. Eaton also did not supervise an intern and that Ms. Loehr had only done so for one or two months before interviewing for the supervisor position in the fall of 2007. A jury could find that Denver Health asserted this highly specific, potentially arbitrary factor as pretext.

The Court turns next to Ms. Lenander's stated perception that Mr. Bradley did not exhibit enthusiasm or interest during the interview and her impression that he believed his seniority entitled him to promotion, rather than being genuinely interested in undertaking supervisory responsibilities within the Department. This stated rationale,

while generally permissible, is highly subjective. Such a statement is susceptible to *post hoc* manipulation in order to avoid the consequences of what may have been, in reality, a discrimination-driven decision. In light of the Court's other determinations at the pretext step, the truth of this assertion must be tested in front of a jury.

The same is true for Ms. Lenander's testimony in her affidavit that she "did not find Mr. Bradley's interview answers as impressive as those of other candidates." Mr. Bradley points to some potentially unimpressive answers of the successful candidates. While such a comparison, by itself, does not necessarily prove discrimination, viewed in the totality of the circumstances, the authenticity of Ms. Lenander's position is sufficiently called into doubt that it contributes to the failure of Denver Health's motion.

Ms. Lenander next asserts that she "previously observed Mr. Bradley with his eyes closed and apparently asleep during Department meetings." Denver Health's Mot. for Summ. J., ex. A-2 (Lenander Aff.) ¶ 17(8). Mr. Bradley testifies in his affidavit that he never slept during department meetings and notes that no disciplinary record exists which corroborates Ms. Lenander's assertion. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., at 8 ¶ 15(8); ex. 6 (Bradley Aff.) ¶ 33. The dispute over this fact could lead a reasonable jury to question whether or not Mr. Bradley slept during meetings or whether Ms. Lenander is asserting this reason as mere pretext for a discriminatory purpose.

The Court next turns to Ms. Lenander's citation of the evidence which purportedly demonstrates Mr. Bradley's lack of initiative and reluctance in handling "certain tasks" or taking on "additional duties." Denver Health's Mot. for Summ. J., at 6-7 ¶ 15(9); ex. A-2 (Lenander Aff.) ¶ 17(9). The first is rooted in two evaluations of Mr. Bradley that Ms. Lenander claims to have received and reviewed. *See* Denver Health's

Mot. for Summ. J., ex. A-26.  The first evaluation contains written comments which suggest that the evaluator would have liked Mr. Bradley to take "more" initiative. Denver Health's Mot. for Summ. J., ex. A-26 at 1.  However, this evaluation appears mostly blank in the copy submitted to the Court and so the relative term "more" is difficult to assess.  Denver Health's Mot. for Summ. J., ex. A-26 at 1.  The second evaluation is more critical of Mr. Bradley, his work ethic, and his "initiative."  *See* Denver Health's Mot. for Summ. J., ex. A-26 at 2-3.

Neither of the two evaluations offered by Denver Health appears to be dated, so it is not clear when they were completed or at what point in Mr. Bradley's career at Denver Health they reflect.  Mr. Bradley argues that, more importantly, they do not reflect his actual performance or the opinions of his peers and supervisors.  To that end, Mr. Bradley provides several more favorable evaluations, the testimony of hospital personnel, awards he has received from Denver Health for his work, and examples of activities and tasks he has undertaken.  Pl.'s Resp. to Def.'s Mot. for Summ. J., exs. 4, 5, 7, 11, 22, 23, 24; ex. 6 (Bradley Aff.) at 5-7 ¶¶ 15, 17-27.  Ms. Lenander claims that she was not aware of this more positive evidence at the time she made the promotion decisions.

As mentioned above, it is not for the Court to determine whether Ms. Lenander was in fact only privy to those evaluations which support her position or whether she cherry-picked Mr. Bradley's personnel file to find evidence which supported her decision.  All the Court must do at summary judgment is decide whether Mr. Bradley has met his burden in showing that a reasonable jury could find Ms. Lenander's

assertions based on the evaluations in exhibit A-26 are pretextual. The Court

concludes that he has.

The next source of information upon which Ms. Lenander purportedly based her

opinion on Mr. Bradley's unwillingness to "take initiative" are the emails from Terence

Shea that were the subject of Mr. Bradley's motion to strike. As the Court noted in the

discussion on Mr. Bradley's motion, Ms. Lenander's statement regarding these emails

is of little assistance in resolving the current dispute. In fact, there is some question as

to whether this constitutes a *legitimate*, nondiscriminatory reason for Denver Health's

promotion decision at all. As noted earlier, the lack of substance and context in the

statement makes it impossible to evaluate its implications. Even assuming that it is a

potentially legitimate reason, however, Ms. Lenander merely testifies that, to the best of

her limited recollection, somebody wanted Mr. Bradley to do something and he

objected. Ms. Lenander does not explain why the emails were sent to her, what the

actual request of Mr. Bradley was, or whether the request was appropriate or whether it

warranted objection. Mr. Bradley surmises that Ms. Lenander's vague characterization

refers to an instance in which he was asked to provide medical services to a patient for

which he was not trained. Denver Health offers no clarification in its reply brief. With all

justifiable inferences in favor of Mr. Bradley, the Court will assume that a jury would

accept Mr. Bradley's interpretation that an objection was warranted. In which case, Mr.

Bradley has made a sufficient showing that there is a disputed fact regarding whether

Ms. Lenander's reference to the Shea emails is nothing more than pretext.

The final fact cited by Denver Health regarding Mr. Bradley's alleged failure to

"take initiative" is Ms. Lenander's recollection that Mr. Bradley contacted her at one

point to state that he had been asked to do HIV testing in the community and did not think it should be part of his job. She went on to explain that, although he ultimately did such testing, it appeared that he did not do so willingly at first. Like the previous citation, the Court finds that the imprecise language in this explanation makes it almost meaningless. A reasonable jury could find this explanation to be pretextual as well.

The Court now turns to Ms. Lenander's affidavit testimony regarding Mr. Bradley's interview performance. These stated reasons represent Ms. Lenander's subjective appraisal of Mr. Bradley's answers which she claims formed the basis of her perception that "Mr. Bradley did not do well on certain interview questions intended to determine whether a candidate could distinguish between: (a) situations which a Supervisor should be able to handle and show initiative in how to handle them; and (b) situations which a Supervisor should take up the chain of command." Denver Health's Mot. for Summ. J., at 6-7 ¶ 15(9); ex. A-2 (Lenander Aff.) ¶ 19.

Mr. Bradley contests Ms. Lenander's claims by suggesting that she mischaracterizes his answers and offers his own recollection and the notes of another interviewer as proof of this mischaracterization. Mr. Bradley also argues that Ms. Lenander focuses on what she considers his inadequate responses, while at the same time ignoring the weak responses to other questions by the successful candidates.

Ms. Lenander criticizes Mr. Bradley for not stating during the interview that he would go up the chain of command after learning that a friend was not working assigned hours or clocking in and out as required. While there is some disagreement about what his exact answer was, Mr. Bradley explained he would address the issue directly with the accused employee; Ms. Lenander explains that she was looking for him

to say that he would take the issue up the chain of command. Conversely, Ms. Lenander states that Mr. Bradley answered two other questions incorrectly by explaining that he would first check with his supervisors for feedback on handling such situations. Ms. Lenander explains her seemingly contradictory view of the appropriateness of consulting superiors in particular situations as being directly connected to the seriousness of the underlying policy concern. However, the apparent contradiction would allow a reasonable jury to rationally find the reasons to be unworthy of credence and, therefore, conclude that Denver Health did not act for the asserted non-discriminatory reasons. This is particularly true, if the jury were to find, as they could, that Ms. Lenander's other articulated reasons were pretextual.

As mentioned previously, most employment decisions will involve some subjective analysis; the presence of such criteria does not, by itself, make a decision impermissible. *See Santana v. City & County of Denver*, 488 F.3d 860, 866 (10th Cir. 2007). The pivotal consideration is whether discriminatory animus belies otherwise permissible criteria. Here, a jury will have to make that determination.

Ms. Lenander claims to have disapproved of the fact that Mr. Bradley applied for all three openings rather than focusing on and demonstrating his interest for one position. This is a somewhat peculiar statement in light of the fact that, as far the record before the Court indicates, two of the positions are extremely similar, with the third being distinct based on the fact that it is school-based. Mr. Bradley claims he applied for all three, in part, because openings do not come up very often. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., ex. 6 (Bradley Aff.) ¶ 6. Furthermore, based on Ms. Lenander's own testimony that "Peter Bradley, Kaelynn Eaton, Amanda Loehr, and

Jennifer Koch were *four of several applicants for three Supervisor positions* that became open in the Fall of 2007," it is not clear whether the successful candidates also applied for more than one position. Denver Health's Mot. for Summ. J., ex. A-2 (Lenander Aff.) ¶ 9 (emphasis added). Therefore, a reasonable jury could find this explanation to be pretextual as well.

Ms. Lenander's final subjective criticism of Mr. Bradley – that he did not have the overall experience in dealing with adolescents, managing programs, and grant writing – is colored by the potential pretext covering the many reasons discussed thus far. *Cf. Bryant*, 432 F.3d at 1126 ("[W]hen the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility." (quoting *Tyler*, 232 F.3d at 814 (quotation marks omitted)). Therefore, a reasonable jury also could find this stated reason to be pretextual.

"We do not always require actual evidence of discrimination because, 'in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.'" *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (alteration and omission marks omitted). Therefore, the Court concludes that Mr. Bradley has met his burden at the third step of the *McDonnell Douglas* analysis by presenting evidence sufficient to

raise a genuine dispute of material fact regarding whether Denver Health's articulated reasons for not promoting Mr. Bradley are pretextual. *See Garrett*, 305 F.3d at 1217. Consequently, Mr. Bradley is entitled to the *McDonnell Douglas* presumption that Denver Health's decision was discriminatory and, therefore, Denver Health's motion for summary judgment on Mr. Bradley's Title VII claim is denied. *Cf. Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003) ("The plaintiff need not show both that the defendant's reasons were a pretext and that the real reason was discrimination – the fact of pretext alone may allow the inference of discrimination.").

### D.  ADEA Claim

Within the ADEA, Congress declared that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1) (2006) (emphasis added).  The Supreme Court recently examined this statute and concluded that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." *Gross v. FBL Financial Servs., Inc.*, --- U.S. ----, ----, 129 S. Ct. 2343, 2350 (2009).  The Court concluded that, in order "[t]o establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  *Gross*, 129 S. Ct. at 2350.  In all ADEA disparate treatment claims, including Mr. Bradley's, the "plaintiff must prove by a preponderance

of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.  *Gross*, 129 S. Ct. at 2351 & n.4.

In the wake of *Gross*, courts have struggled somewhat in deciding whether the *McDonnell Douglas* tripartite framework continues to apply to ADEA cases.  *See, e.g*, *Ferruggia v. Sharp Elecs. Corp.,* No. 05-5992, 2009 WL 2634925, at *3-4 (D.N.J. Aug. 25, 2009) (discussing cases).  Prior to *Gross*, courts regularly applied the *McDonnell Douglas* presumptions to ADEA claims.  *See, e.g.*, *Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008).  After *Gross*, however, some courts have called into question the applicability of *McDonnell Douglas* to these claims.  *See, e.g.*, *Woods v. Boeing Co.*, 355 F. App'x 206, 211 (10th Cir. 2009) (Anderson, J., concurring in part) (citing *Paup v. Gear Prods., Inc.*, 327 F. App'x 100, 113 (10th Cir. 2009)).  The *Gross* opinion itself left the question unanswered.  *See Gross*, 129 S. Ct. at 2349 n.2 ("[T]he Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), utilized in Title VII cases is appropriate in the ADEA context.").  Therefore, absent further action from the Supreme Court or an en banc decision of the Tenth Circuit, binding authority in this Circuit holds that the *McDonnell Douglas* framework applies to ADEA claims.  *See, e.g.*, *Phillips v. The Pepsi Bottling Group*, No. 08-1003, 2010 WL 1619259, at *3 (10th Cir. 2010) (unpublished opinion); *Fuller v. Seagate Tech., LLC*, 651 F. Supp. 2d 1233, 1242 & n.9 (D. Colo. 2009).

*Gross* has altered the analysis in some ways.  Prior to *Gross*, "the employee could prevail if the evidence, viewed in the light most favorable to the plaintiff, would

permit a jury to find that her dismissal was motivated at least in part by age discrimination." *Phillips*, 2010 WL 1619259, at *3 (quoting *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010)) (quotation marks omitted). "*Gross* changed the latter part of this formulation by eliminating the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases." *Phillips*, 2010 WL 1619259, at *3 (quoting *Gorzynski*, 596 F.3d at 106)) (quotation marks omitted). Furthermore, the Tenth Circuit has explained that even at summary judgment "it is not the employer's burden to negate any possible contributory role played by age in the challenged adverse action but, conversely, the employee's burden to show that age was the 'but for' cause of the action." *Medlock v. United Parcel Service, Inc.*, 608 F.3d 1185, 1193 (10th Cir. 2010) (citing *Gross*, 129 S. Ct. at 2351).

Therefore, in the wake of *Gross*, the Tenth Circuit appears to be endorsing closer district court consideration of whether, in addition to meeting the *McDonnell Douglas* three-part test, the plaintiff can show that age was a but-for cause of the challenged decision. *See Medlock*, 608 F.3d at 1193. It is not clear how exactly this consideration is to make its way into the analysis. *Medlock* suggests that it could come in at *McDonnell Douglas*' pretext stage. *Medlock*, 608 F.3d at 1194. In the alternative, *Medlock* appears to be stating that the lack of but-for causation could undermine the reasonable inference of age discrimination that might otherwise arise due to *McDonnell Douglas. See Medlock*, 608 F.3d at 1194. Under this approach the but-for consideration could be an overarching or subsequent consideration.

Because Mr. Bradley does not present direct evidence to support his age discrimination claim, the analysis of his claim proceeds under the three-step framework of *McDonnell Douglas*. *See Sanders*, 544 F.3d at 1105. Under the first step, the plaintiff may prove a prima facie case by establishing that (1) he was within the protected class of individuals 40 or older; (2) he performed satisfactory work; (3) he was not promoted; and (4) a younger person was promoted. *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010) (citing *Adamson v. Multi-Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008)). For purposes of its present motion, Denver Health concedes that Mr. Bradley meets his burden to establish a prima facie case of age discrimination. *See* Denver Health's Mot. for Summ. J. at 15.

Denver Health argues, instead, that it is entitled to summary judgment because Mr. Bradley has failed to show that age was the but-for cause of Denver Health's decision not to promote him. Denver Health is correct that, if the undisputed facts showed that it had both permissible and impermissible motives for its decision not to promote Mr. Bradley, Mr. Bradley could not prevail on his ADEA claim. The Court noted in the analysis of Mr. Bradley's Title VII claim that the believability, and hence the legitimacy, of Denver Health's stated reasons is in genuine dispute. In arguing pretext under his ADEA claim, Mr. Bradley raises many, but not all, of the arguments that proved persuasive under his Title VII claim. However, while there was an indication that Denver Health's articulated reasons may disguise sex-based discrimination, there is no indication that they conceal age-based animus. Instead, the evidence shows that in the ten years leading up to its 2007 decisions, Denver Health hired or promoted at least three individuals of Mr. Bradley's approximate age into a Clinical Social Work

Supervisor position: Randall Yarbrough, a fifty-three-year-old male, in 2001; Carol Lewis, a fifty-three-year-old woman, in 1998; and Teri Classick, a fifty-five-year-old woman, in 2006. In this context, the fact that the four successful candidates in 2007 were all in their thirties has far less force and is insufficient to demonstrate that Denver Health's articulated reasons amount to pretext for age discrimination.

Furthermore, if the *Gross* but-for requirement for ADEA claims is applied as an overarching or subsequent consideration, it also prevents Mr. Bradley's ADEA claim from going to trial. None of Mr. Bradley's evidence "affirmatively supports an inference that age played any role in [the] decision" by Denver Heath to not promote Mr. Bradley. *Medlock*, 608 F.3d at 1194. Similar to the plaintiff in *Medlock*, Mr. Bradley has been unable to demonstrate that there is "a triable issue of pretext – or, alternatively, in prima facie case terms, [evidence which gives] rise to a reasonable inference of age discrimination." *Medlock*, 608 F.3d at 1194.

Therefore, because no reasonable jury could rationally conclude that Denver Health had discriminatory animus based on Mr. Bradley's age, Denver Health is entitled to summary judgment on his ADEA claims. Denver Health's motion for summary judgment is this regard is granted.

## IV. CONCLUSION

Based on the foregoing, it is

**ORDERED** that plaintiff Peter Bradley's motion to strike [Docket No. 47] is DENIED. It is further

**ORDERED** that defendant Denver Health and Hospital Authority's motion for summary judgment [Docket No. 39] is GRANTED in part and DENIED in part.  Mr. Bradley's second claim for relief, brought under Title VII, remains pending in this case. Any final judgment entered upon resolution of all claims against all parties shall enter judgment in favor of defendant Denver Health and Hospital Authority and against plaintiff Peter Bradley on plaintiff's first claim for relief, brought under the Age Discrimination in Employment Act.

DATED August 24, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge